# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re:

BIOAMBER INC.,[1]

Debtor in a foreign proceeding.

Chapter 15

Case No. 18– __11291__ (LSS)

### DECLARATION OF MARIO SETTINO
### IN SUPPORT OF (I) VERIFIED CHAPTER 15 PETITION;
### AND (II) MOTION OF FOREIGN REPRESENTATIVE FOR
### ENTRY OF ORDER GRANTING RECOGNITION OF FOREIGN
### MAIN PROCEEDING AND CERTAIN RELATED RELIEF

1. I, Mario Settino, hereby submit this declaration (the "**Declaration**") in support of the (a) verified chapter 15 petition of the Debtor and (b) *Motion of Foreign Representative for Entry of Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief* (the "**Recognition Motion**"), and state as follows:

2. I am the Chief Financial Officer of BioAmber Inc., the authorized foreign representative (the "**Foreign Representative**") of the above-captioned debtor (the "**Debtor**"), who has commenced a proceeding (the "**CCAA Proceeding**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), pending before the Québec Superior Court, Commercial Division (the "**Canadian Court**").

3. On May 24, 2018, the Canadian Court entered the initial order, a copy of which is attached hereto as **Exhibit A** (the "**CCAA Initial Order**"), which, among other things, authorized the Debtor, in its capacity as a foreign representative, to commence this chapter 15 case and seek recognition of the CCAA Proceeding as a foreign main proceeding.

---

[1] The last four digits of the Debtor's federal tax identification number are 1045. The Debtor's principal offices are located at 1250 René-Lévesque Blvd. West, Suite 4310, Montréal, Québec H3B 4W8, Canada.

4. In my role as the Chief Financial Officer of the Debtor, I have become familiar with the Debtor's business, day-to-day operations, and financial affairs. I have also been closely involved in the Debtor's financing and restructuring efforts to date. I am an individual over the age of 18 and, if called upon, could and would testify to the facts set forth in this Declaration. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management and professionals, learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's industry, operations, and financial condition.

## OVERVIEW OF THE BUSINESS

### A. Company Background

5. The Debtor is a sustainable chemicals company. Its proprietary technology platform combines industrial biotechnology and chemical catalysis to convert renewable feedstock into building block chemicals for use in a wide variety of everyday products, including plastics, resins, food additives, and personal care products. The Debtor currently sells its first product, bio-succinic acid, to customers in a variety of chemical markets.

6. The Debtor's core product is bio-based succinic acid, which can be used to make a broad range of products. The Debtor can also transform its bio-based succinic acid into 1,4-Butanedial ("**BDO**") and Tetrahydrofuran ("**THF**") in a single catalytic step. BDO and THF are used to make engineering plastics, polyurethanes, biodegradable polyesters, spandex, and other specialty chemicals.

7. The Debtor is managed on a consolidated basis out of its corporate headquarters in Montréal, Quebec (the "**Montréal Office**"). All corporate-level decision-making

and corporate administrative functions affecting the Debtor, including decisions on capital expenditures and business development initiatives, are centralized in the Montréal Office. Additionally, all active business operations of the Debtor are undertaken, and all producing assets of the Debtor's operating subsidiaries are located in, Canada.

**B.   Corporate Structure**

    **i.   BioAmber Inc.**

8.   The Debtor was incorporated in the State of Delaware in October 2008 as DNP Green Technology, Inc. and was established as the result of a spin-off of certain assets from Diversified Natural Products, Inc.  In September 2010, DNP Green Technology, Inc. changes its name to BioAmber Inc.

9.   The Debtor's securities historically traded on the New York Stock Exchange ("**NYSE**") under the symbol "BIOA."  The Debtor's securities also historically traded on the Toronto Stock Exchange ("**TSX**").  On March 12 and 16, 2018, the Debtor's common stock was delisted from the NYSE and TSX, respectively, and now trade on the over-the-counter "Pink Sheets Market."

10.   The Debtor's principal executive office is located at 4310-1250 boulevard René-Lévesque, Montréal, Québec H3B 4W8 and its registered place of business is located at 1000 Westgate Drive, Suite 115, St. Paul, Minnesota, 55114.

11.   Certain of the Debtor's executives, including myself and the General Counsel, are located in Canada, where day-to-day decision-making functions, board meetings, annual shareholder meetings, and most other corporate meetings concerning the Debtor's operations take place.

12. The Debtor has two wholly-owned subsidiaries: BioAmber Canada Inc. ("**BioAmber Canada**") and BioAmber Sarnia Inc. ("**BioAmber Sarnia**" and, together with BioAmber Canada, the "**Canadian Subsidiaries**").[2] The Debtor conducts substantially all of its business through its Canadian Subsidiaries.

### ii. BioAmber Canada

13. BioAmber Canada is a corporation incorporated pursuant to the laws of Canada, with its principal place of business at the Montréal Office.

14. BioAmber Canada's role within the Debtor's corporate structure is to provide management, accounting, finance, and human resource services to support the operations of the Debtor and BioAmber Sarnia, pursuant to a *Management Services Agreement* dated October 15, 2008. Specifically, BioAmber Canada provides the following management services to the Debtor: (a) advice and assistance in respect of strategic planning matters, including, without limitation, the establishment of business plans, annual budgets, and general policies; (b) executive management services, including those relating to capital raises and cash management; (c) investor relations and corporate communication functions; (d) accounting and other financial services, including, without limitation, the putting in place of necessary financing controls and processes intended to deliver the business plans; and (e) all other management services requested from time to time by the Debtor.

### iii. BioAmber Sarnia

15. BioAmber Sarnia is a corporation incorporated pursuant to the laws of Canada, with its principal place of business at 1201 Vidal Street South, Sarnia, Ontario, N7T

---

[2] The Debtor and the Canadian Subsidiaries are collectively referred to herein as the "**Company**."

DOCS_SF:96937.3

7M2 (the "**Sarnia Facility**"). The directors and management of BioAmber Sarnia are located at the Montréal Office.

16. BioAmber Sarnia is the Debtor's operating company, conducting business activities from the Sarnia Facility. BioAmber Sarnia was formed as a joint venture, with BioAmber Inc. originally owning a 70% interest and Mitsui & Co. Ltd. ("**Mitsui**") owning the remaining 30% interest. On August 1, 2017, BioAmber purchased Mitsui's remaining joint venture interest in BioAmber Sarnia.

17. As indicated above, the Debtor's business activities have always been intertwined with its Canadian Subsidiaries such that no single entity functions independent of the others. The Debtor and its Canadian Subsidiaries have always shared the same management, accounting, finance, and human resources personnel. Moreover, the Debtor and the Canadian Subsidiaries have historically managed their assets and presented their financial statements on a consolidated basis.

    C. **Debtor Assets**

        i. **Real Property**

18. The bio-succinic acid discussed above is produced by BioAmber Sarnia at the Sarnia Facility. The Sarnia Facility is owned by BioAmber Sarnia and is located within a bio-industrial park in Sarnia, Ontario. The site is co-located in a large petrochemical hub with existing infrastructure that facilitates access to utilities and certain raw materials and finished product, including steam, electricity, cooling water, and water treatment. The Sarnia Facility has a nameplate capacity of 30,000 metric tons of bio-succinic acid per year.

19. The Sarnia Facility has received ISO 9001 (for its quality management system), ISO 14001 (for its environmental management system), OHSAS 18001 (for its health

5

and safety management system), and FSSC 22000 certification (for its food safety management system). These certifications were granted by accredited certification bodies following audits of the Sarnia Facility in the fourth quarter of 2015 and were renewed in 2016.

20. In addition to the Sarnia Facility, the Debtor leases 3,000 square feet of office and laboratory space in St. Paul, Minnesota, which includes research and development facilities with capabilities in molecular biology, fermentation, analytical chemistry, pilot scale catalysis and purification.

21. The Montréal Office consists of 6,786 square feet of administrative office space that is leased under an agreement that expires in May 2022, and for which BioAmber Canada has the option to renew for an additional five-year period. However, on May 29, 2018, BioAmber Canada issued a termination notice to the landlord, terminating the lease of the Montréal Office effective June 29, 2018.

### ii. Other Assets

22. The aggregate net book value of the company's consolidated assets as of December 31, 2017 are as follows:

| Nature | Net Book Value (USD) |
|---|---|
| Cash and cash equivalents | $4,631,670 |
| Accounts receivable | $4,864,705 |
| Inventories | $4,823,346 |
| Prepaid expenses and deposits | $541,264 |
| Restricted cash (current) | $386,888 |
| Property and equipment | $49,461,250 |
| Investment in equity method and cost investments | $446,806 |
| Intangible assets | $4,035,533 |
| Goodwill | $0 |
| Restricted cash (long-term) | $298,800 |
| Deferred financing costs | $23,633 |
| **TOTAL** | **$69,513,895** |

### D.     Debtor Liabilities[3]

23.     The Debtor's estimated outstanding liabilities are summarized as follows:

| No. | Description | Amount |
|---|---|---|
| **Secured Debt** | | |
| 1. | Senior secured loan from Comerica Bank, Export Development Canada, and Farm Credit Canada (the "**Senior Secured Loan**") | $14,422,615 |
| 2. | Secured loan from Ontario Minister of Economic Development under the Sustainable Jobs and Investment Fund (the "**SJIF Loan**") | $15,000,000 |
| 3. | Legal proceedings relating to the secured demand non-revolving credit facility from Bridging Finance Inc. (the "**Bridging Facility Claim**") | $922,000 |
| 4. | Secured Indemnity Agreement with Mitsui (the "**Mitsui Indemnity Agreement**") | Unknown |
| **Unsecured Debt** | | |
| 5. | Loan from the Canadian Minister of Agriculture and Agri-Food (the "**MAAF Loan**") | $9,074,074 |
| 6. | Securities Class Action | Unknown |

**i.     The Senior Secured Loan**

24.     On June 20, 2014, BioAmber Sarnia signed a loan agreement with a financial consortium, comprised of Comerica Bank, Export Development Canada, and Farm Credit Canada (collectively, the "**Senior Secured Lenders**") for a Senior Secured Loan (as amended) in the principal amount of $20 million, which was disbursed on May 12, 2015.

25.     The principal due under the Senior Secured Loan is currently repayable in equal, quarterly installments of $962,000 from March 2018 through December 2021, with the entire balance being prepayable without penalty.

---

[3]     All dollar amounts in this section are in Canadian dollars.

DOCS_SF:96937.3

26. BioAmber Sarnia's obligations under the Senior Secured Loan are secured by (i) a first-ranking security interest on all of BioAmber Sarnia's assets and (ii) a pledge by the Debtor of its equity interest in BioAmber Sarnia.

27. In addition, the Debtor has provided the Senior Secured Lenders with a guarantee of 70% of BioAmber Sarnia's secured obligations under the Senior Secured Loan and Mitsui has provided a guarantee of the remaining 30% of the secured obligations under the Senior Secured Loan, which is capped at $6 million plus accrued interest on the secured obligations and fees and expenses.  The Debtor and BioAmber Sarnia have agreed to indemnify Mitsui in relation to any payment it is required to make in relation to these obligations pursuant to the Mitsui Indemnity Agreement, as discussed further below.

28. The proceeds of the loan were used by BioAmber Sarnia to complete the construction of the Sarnia Facility and fund its startup and commissioning.

29. As of May 4, 2018, an aggregate amount of $14,422,615, net of restricted cash and excluding interest, was owed to the Senior Secured Lenders pursuant to the Senior Secured Loan.

   **ii.    The SIJF Loan**

30. On September 30, 2011, BioAmber Sarnia and the Ontario Minister of Economic Development and Trade ("**OMEDT**") entered into an agreement pursuant to which the SIJF Loan of $15 million was granted to BioAmber Sarnia from the Sustainable Jobs Innovation Fund.

31. The SIJF Loan was interest free during the first five years, conditionally upon BioAmber Sarnia creating and retaining a certain average number of employees per year. Subsequently, the SIJF Loan bears interest at an annual rate of 3.98% (or 5.98% if the

cumulative job targets were not met in the first five years).  The principal of the SIJF Loan is repayable in five annual equal installments beginning from the sixth anniversary date of disbursement.

32.  The SIJF Loan is secured by (i) a security interest in BioAmber Sarnia's present and future accounts receivable, inventory, equipment, and other personal property and (ii) a mortgage against the Sarnia Facility.  The Debtor has also provided OMEDT with a guarantee to secure BioAmber Sarnia's obligations under the SIJF Loan.

33.  As of May 9, 2018, an aggregate amount of $15,000,000, net of restricted cash and excluding interest, was owed to OMEDT pursuant to the SIJF Loan.

### iii.    The Bridging Facility Claim

34.  On September 9, 2016, the company entered into an agreement for a demand non-revolving credit facility with Bridging Finance Inc. ("**Bridging**"), and received the loan proceeds of $25 million, net of financing fees (the "**Bridging Facility**").  The proceeds were used to repay in full the outstanding principal amount of an existing loan and to fund general corporate expenses.

35.  Amounts due pursuant to the Bridging Facility were secured by substantially all of the assets of BioAmber Canada and the Debtor, with the exception of certain identified licenses and the equity interest in BioAmber Sarnia (collectively, the "**Bridging Security**").

36.  On January 27, 2017, the Bridging Facility was fully repaid.  On February 17, 2017, Bridging filed the Bridging Facility Claim against BioAmber Sarnia before the Superior Court of Justice of Ontario seeking approximately $922,000 as damages for breach of contract, unjust enrichment, or quantum meruit, in relation to the alleged failure to pay certain

9

prepayment penalties, interest, and waiver fees in connection with the prepayment of the Bridging Facility. As a result of this ongoing litigation, Bridging has not released its security interest in the Bridging Security.

### iv. Mitsui Indemnity Agreement

37. On August 1, 2017, the Debtor and BioAmber Sarnia, on the one hand, and Mitsui, on the other hand, entered into the Mitsui Indemnity Agreement pursuant to which the Debtor and BioAmber Sarnia agreed to indemnify Mitsui for any payments made by Mitsui pursuant to its guarantees to OMEDT in relation to the SIJF Loan and to the Senior Secured Lenders in relation to the Senior Secured Loan.

38. The obligations of the Debtor under the Mitsui Indemnity Agreement are secured by all of its personal property, excluding certain of its assets, such as the shares of BioAmber Sarnia.

### v. The MAAF Loan

39. On March 10, 2014, BioAmber Sarnia and the Canadian Minister of Agriculture and Agri-Food ("**MAAF**") entered into a repayable contribution agreement pursuant to which the non-interest bearing MAAF Loan of $10 million was provided to BioAmber Sarnia under the Agri Innovation Program.

40. As of May 4, 2018, an aggregate amount of $9,074,074, net of restricted cash and excluding interest, was owed to MAAF pursuant to the MAAF Loan. The Debtor guaranteed BioAmber Sarnia's obligations under the MAAF Loan.

### vi. The Securities Class Action

41. On March 18, 2017, a putative securities class action lawsuit was filed against the Debtor and certain of its executives in federal district court in New York alleging

violations of the United States Exchange Act and the United States Securities Act. The complaint principally alleges that the prospectus for a January 2017 follow-on public offering failed to disclose the postponement of a large customer order.

42. On June 6, 2017, the Court appointed a lead plaintiff and lead counsel. On August 7, 2017, the lead plaintiff filed an amended complaint, which alleges violations of the United States Exchange Act. There are no United States Securities Act claims alleged in the amended complaint. The amended complaint is premised on allegedly false and misleading fourth quarter 2016 and fiscal year 2016 revenue projections set forth in the prospectuses for December 2016 and January 2017 public offerings.

43. On October 6, 2017, the Debtor and the other defendants filed a motion to dismiss the amended complaint. On February 9, 2018, the plaintiff filed a motion to, *inter alia*, convert defendants' motion to dismiss to a motion for summary judgment.

44. The foregoing motions are pending before the United States District Court for the Eastern District of New York, but were stayed contemporaneously with the filing of the Chapter 11 Case.

### E. Events Leading to CCAA Proceeding and Chapter 15 Case

#### i. Historical Operating Losses

45. The Company started commercial operations at the end of 2015, and is currently ramping-up production at the Sarnia Facility. Accordingly, the Company is like a traditional start-up and has incurred losses from business operations since its inception.

46. As of December 31, 2017, there was an accumulated deficit of $318.9 million and a net loss of $102.2 million, including a non-cash impairment loss and write-off of property, equipment, and intangibles of $77.6 million.

47. The attainment of profitable operations is dependent upon future events, including successful ramp-up of the commercial-scale manufacturing Sarnia Facility, further advancing existing commercial arrangements with strategic partners to generate revenue from the sale of products that will support the Company's cost structure, gaining market acceptance for their bio-succinic acid, its derivatives and other building block chemicals, obtaining adequate financing to complete development activities, and attracting and retaining qualified personnel.

48. Another factor which has caused problems for the Company in attempting to increase sales is the relatively low price of oil, which is the raw material for products which bio-succinic acid competes against.

**ii.    Liquidity Concerns and Sale Process**

49. The Company estimates that approximately $8 million to $10 million of additional financing, to be disbursed in tranches, is needed over the next 4 to 6 months to continue operating the business at the Sarnia Facility and to engage in a fulsome sale and investment solicitation process ("**SISP**") with the ultimate goal of finding a financial or strategic buyer for the Company's assets and business as a going concern.

50. I believe that continuing operations at the Sarnia Facility will bring far more value to the creditors and other stakeholders than the incremental cost of continuing such operations, for the following reasons:[4]

   a. The Company's advisors estimate that the sale of its assets to a strategic or financial investor will realize approximately twice the value for creditors and other stakeholders as compared to a forced liquidation.

---

[4] Production at the Sarnia Facility ceased on May 11, 2018 due to a shortage of raw materials. The Company anticipates resuming production once it receives postpetition financing, which it expects to occur around June 20, 2018.

DOCS_SF:96937.3

b. Putting the Sarnia Facility in care and maintenance mode will cause operating staff and customers to leave, which will make the business inherently less attractive to potential purchasers who would like to operate it, especially strategic investors.

c. The incremental cost of continuing operation of the Sarnia Facility, as opposed to putting it in care and maintenance mode, is estimated to be limited to $3 million over the next four months. Sales of inventory and the collection of accounts receivable after the four month period will reduce this differential.

d. The value of the Company as a going concern has been estimated to be more than $30 million greater than an orderly liquidation value.

e. The Company is simultaneously implementing a number of cost-cutting initiatives which will reduce the cash usage as compared to historical operational data.

f. The Company has received indications that the demand for its assets and business is significant, and has already been contacted by several interested potential purchasers who would like to operate the Sarnia Facility as a going concern.

51. The Company, together with its advisors, has initiated a sale process with the following milestones:

| No. | Description | Date |
|---|---|---|
| 1. | Identify potential going concern purchasers and potential debt and/or equity investors. | June 1, 2018 |
| 2. | Solicitation of offers to potential purchasers or investors, with access to a data room for those who have signed NDAs. | June 2 to June 20, 2018 |
| 3. | Deadline for submissions of indications of interest. | June 20, 2018 |
| 4. | Deadline to complete due diligent and submit a binding offer. | July 20, 2018 |
| 5. | Execution of successful bid transaction documents. | July 31, 2018 |

52. I believe that the proposed sale process, conducted under the supervision of the Canadian Court, is in the best interests of the Debtor and its creditors and other stakeholders. In addition, as described in the Recognition Motion, I understand and believe that

recognizing the CCAA Proceeding as a foreign main proceeding is consistent with the purpose of chapter 15 of the Bankruptcy Code and United States public policy and will facilitate the sale process. Therefore, I believe that the relief requested in the Recognition Motion is necessary and appropriate and is in the best interests of the Debtor, its creditors, and other parties in interest.

## **CONCLUSION**

53. Based on the foregoing, I believe that the relief being requested pursuant to the Recognition Motion is justified, necessary under the circumstances, in the best interests of the Debtor and its creditors, and should be granted.

*[Remainder of page intentionally left blank]*

I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief, and that the copy of the CCAA Initial Order attached hereto as **Exhibit A** is a true and correct copy of the same as entered by the Canadian Court.

Dated:  May 30, 2018

By: _____
Mario Settino
Title:  Chief Financial Officer