IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BIOAMBER INC.,[1]<br><br>Debtor in a foreign proceeding. | Chapter 15<br><br>Case No. 18– __11291__ (LSS)<br><br>**Objection Deadline: June 13, 2018 at 4:00 p.m.**<br>**Hearing Date: June 20, 2018 at 2:00 p.m.** |

**MOTION OF FOREIGN REPRESENTATIVE
FOR ENTRY OF ORDER GRANTING RECOGNITION OF
FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF**

BioAmber Inc., the authorized foreign representative (the "**Foreign Representative**") of the above-captioned debtor ("**BioAmber**" or the "**Debtor**") in proceedings (the "**CCAA Proceeding**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), pending before the Québec Superior Court, Commercial Division (the "**Canadian Court**"), respectfully submits this motion (the "**Motion**") for the entry of an order granting the chapter 15 petition in this case and recognizing the CCAA Proceeding as a foreign main proceeding under section 1517 of the Bankruptcy Code.

In support of this Motion, the Foreign Representative relies upon the (a) *Declaration of Mario Settino in Support of (I) Verified Chapter 15 Petition; and (II) Motion of Foreign Representative for Entry of Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief* (the "**Settino Declaration**") and (b) *Memorandum of Law of Foreign Representative in Support of (I) Verified Chapter 15 Petition; and (II) Motion of Foreign Representative for Entry of Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief* (the "**Memorandum of Law**"), filed contemporaneously herewith and

---

[1] The last four digits of the Debtor's federal tax identification number are 1045. The Debtor's principal offices are located at 1250 René-Lévesque Blvd. West, Suite 4310, Montréal, Québec H3B 4W8, Canada.

each of which is incorporated herein by reference. In further support of the relief requested herein, the Foreign Representative respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This case has been properly commenced pursuant to section 1504 of Title 11 of the United States Code (the "**Bankruptcy Code**") by the filing of a petition for recognition of the CCAA Proceeding pursuant to section 1515 of the Bankruptcy Code.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Rule 9013-1(f) of the *Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "**Local Rules**"), the Foreign Representative consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3. Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

## RELIEF REQUESTED

4. By this Motion, the Foreign Representative seeks the entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) granting the chapter 15 petition and recognizing the CCAA Proceeding as a foreign main proceeding under section 1517 of the Bankruptcy Code, (b) giving full force and effect in the United States to the initial order issued by the Canadian Court on May 24, 2018 (the "**CCAA Initial Order**"),[2] including any extensions or amendments thereof approved by the Canadian Court, and (c) granting such other and further relief as this Court deems just and proper.

---

[2] A copy of the CCAA Initial Order is attached to the Settino Declaration as **Exhibit A**.

**BACKGROUND**

A.  **The Chapter 15 Petition**

5.  On May 24, 2018, BioAmber commenced the CCAA Proceeding in the Canadian Court and the Canadian Court issued the CCAA Initial Order granting certain provisional relief in connection with the CCAA Proceeding.

6.  Subsequently, on the date hereof (the "**Commencement Date**"), the Foreign Representative commenced this chapter 15 case by filing, among other things, a verified chapter 15 petition seeking recognition by the Court of the CCAA Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

7.  Prior to the Commencement Date, on May 4, 2018, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court (Case No. 18-11078-LSS, the "**Chapter 11 Case**").  The Foreign Representative has filed, contemporaneously herewith, a motion to dismiss the Chapter 11 Case upon recognition of the CCAA Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

B.  **Company Background**

8.  The Debtor is a sustainable chemicals company.  Its proprietary technology platform combines industrial biotechnology and chemical catalysis to convert renewable feedstock into building block chemicals for use in a wide variety of everyday products, including plastics, resins, food additives, and personal care products.  The Debtor currently sells its first product, bio-succinic acid, to customers in a variety of chemical markets.

9.  The Debtor's core product is bio-based succinic acid, which can be used to make a broad range of products.  The Debtor can also transform its bio-based succinic acid into 1,4-Butanedial ("**BDO**") and Tetrahydrofuran ("**THF**") in a single catalytic step.  BDO and THF

are used to make engineering plastics, polyurethanes, biodegradable polyesters, spandex, and other specialty chemicals.

10. The Debtor is managed on a consolidated basis out of its corporate headquarters in Montréal, Quebec (the "**Montréal Office**").  All corporate-level decision-making and corporate administrative functions affecting the Debtor, including decisions on capital expenditures and business development initiatives, are centralized in the Montreal Office. Additionally, all active business operations of the Debtor are undertaken, and all producing assets of the Debtor's operating subsidiaries are located in, Canada.

C. **BioAmber's Corporate Structure**

  i. **BioAmber Inc.**

11. The Debtor was incorporated in the State of Delaware in October 2008 as DNP Green Technology, Inc. and was established as the result of a spin-off of certain assets from Diversified Natural Products, Inc.  In September 2010, DNP Green Technology, Inc. changes its name to BioAmber Inc.

12. The Debtor's securities historically traded on the New York Stock Exchange ("**NYSE**") under the symbol "BIOA."  The Debtor's securities also historically traded on the Toronto Stock Exchange ("**TSX**").  On March 12 and 16, 2018, the Debtor's common stock was delisted from the NYSE and TSX, respectively, and now trade on the over-the-counter "Pink Sheets Market."

13. The Debtor's principal executive office is located at 4310-1250 boulevard René-Lévesque, Montréal, Québec H3B 4W8 and its registered place of business is located at 1000 Westgate Drive, Suite 115, St. Paul, Minnesota, 55114.

14. The Debtor's Chief Financial Officer, Mario Settino, and other executives, including its General Counsel, are located in Canada, where day-to-day decision-making functions, board meetings, annual shareholder meetings, and most other corporate meetings concerning the Debtor's operations take place.

15. The Debtor has two wholly-owned subsidiaries: BioAmber Canada Inc. ("**BioAmber Canada**") and BioAmber Sarnia Inc. ("**BioAmber Sarnia**" and, together with BioAmber Canada, the "**Canadian Subsidiaries**").[3] The Debtor conducts substantially all of its business through its Canadian Subsidiaries.

### ii. BioAmber Canada

16. BioAmber Canada is a corporation incorporated pursuant to the laws of Canada, with its principal place of business at the Montréal Office.

17. BioAmber Canada's role within the Debtor's corporate structure is to provide management, accounting, finance, and human resource services to support the operations of the Debtor and BioAmber Sarnia, pursuant to a *Management Services Agreement* dated October 15, 2008. Specifically, BioAmber Canada provides the following management services to the Debtor: (a) advice and assistance in respect of strategic planning matters, including, without limitation, the establishment of business plans, annual budgets, and general policies; (b) executive management services, including those relating to capital raises and cash management; (c) investor relations and corporate communication functions; (d) accounting and other financial services, including, without limitation, the putting in place of necessary financing controls and processes intended to deliver the business plans; and (e) all other management services requested from time to time by the Debtor.

---

[3] The Debtor and the Canadian Subsidiaries are collectively referred to herein as the "**Company**."

DOCS_SF:96797.3

      **iii.**      **BioAmber Sarnia**

18.    BioAmber Sarnia is a corporation incorporated pursuant to the laws of Canada, with its principal place of business at 1201 Vidal Street South, Sarnia, Ontario, N7T 7M2 (the "**Sarnia Facility**").  The directors and management of BioAmber Sarnia are located at the Montréal Office.

19.    BioAmber Sarnia is the Debtor's operating company, conducting business activities from the Sarnia Facility.  BioAmber Sarnia was formed as a joint venture, with BioAmber Inc. originally owning a 70% interest and Mitsui & Co. Ltd. ("**Mitsui**") owning the remaining 30% interest.  On August 1, 2017, BioAmber purchased Mitsui's remaining joint venture interest in BioAmber Sarnia.

20.    As indicated above, the Debtor's business activities have always been intertwined with its Canadian Subsidiaries such that no single entity functions independent of the others.  The Debtor and its Canadian Subsidiaries have always shared the same management, accounting, finance, and human resources personnel.  Moreover, the Debtor and the Canadian Subsidiaries have historically managed their assets and presented their financial statements on a consolidated basis.

    **D.**    **Debtor Assets**

      **i.**    **Real Property**

21.    The bio-succinic acid discussed above is produced by BioAmber Sarnia at the Sarnia Facility.  The Sarnia Facility is owned by BioAmber Sarnia and is located within a bio-industrial park in Sarnia, Ontario.  The site is co-located in a large petrochemical hub with existing infrastructure that facilitates access to utilities and certain raw materials and finished

product, including steam, electricity, cooling water, and water treatment. The Sarnia Facility has a nameplate capacity of 30,000 metric tons of bio-succinic acid per year.

22. The Sarnia Facility has received ISO 9001 (for its quality management system), ISO 14001 (for its environmental management system), OHSAS 18001 (for its health and safety management system), and FSSC 22000 certification (for its food safety management system). These certifications were granted by accredited certification bodies following audits of the Sarnia Facility in the fourth quarter of 2015 and were renewed in 2016.

23. In addition to the Sarnia Facility, the Debtor leases 3,000 square feet of office and laboratory space in St. Paul, Minnesota, which includes research and development facilities with capabilities in molecular biology, fermentation, analytical chemistry, pilot scale catalysis and purification.

24. The Montréal Office consists of 6,786 square feet of administrative office space that is leased under an agreement that expires in May 2022, and for which BioAmber Canada has the option to renew for an additional five-year period. However, on May 29, 2018, BioAmber Canada issued a termination notice to the landlord, terminating the lease of the Montréal Office effective June 29, 2018.

    **ii.**     **Other Assets**

25. The aggregate net book value of the Company's consolidated assets as of December 31, 2017 are as follows:

| Nature | Net Book Value (USD) |
|---|---|
| Cash and cash equivalents | $4,631,670 |
| Accounts receivable | $4,864,705 |
| Inventories | $4,823,346 |
| Prepaid expenses and deposits | $541,264 |
| Restricted cash (current) | $386,888 |
| Property and equipment | $49,461,250 |
| Investment in equity method and cost investments | $446,806 |
| Intangible assets | $4,035,533 |
| Goodwill | $0 |
| Restricted cash (long-term) | $298,800 |
| Deferred financing costs | $23,633 |
| TOTAL | **$69,513,895** |

### E.     Debtor Liabilities[4]

26.     The Debtor's estimated outstanding liabilities are summarized as follows:

| No. | Description | Amount |
|---|---|---|
| **Secured Debt** | | |
| 1. | Senior secured loan from Comerica Bank, Export Development Canada, and Farm Credit Canada (the "**Senior Secured Loan**") | $14,422,615 |
| 2. | Secured loan from Ontario Minister of Economic Development under the Sustainable Jobs and Investment Fund (the "**SJIF Loan**") | $15,000,000 |
| 3. | Legal proceedings relating to the secured demand non-revolving credit facility from Bridging Finance Inc. (the "**Bridging Facility Claim**") | $922,000 |
| 4. | Secured Indemnity Agreement with Mitsui (the "**Mitsui Indemnity Agreement**") | Unknown |
| **Unsecured Debt** | | |
| 5. | Loan from the Canadian Minister of Agriculture and Agri-Food (the "**MAAF Loan**") | $9,074,074 |
| 6. | Securities Class Action | Unknown |

#### i.     The Senior Secured Loan

27.     On June 20, 2014, BioAmber Sarnia signed a loan agreement with a financial consortium, comprised of Comerica Bank, Export Development Canada, and Farm

---

[4] All dollar amounts in this section are in Canadian dollars.

Credit Canada (collectively, the "**Senior Secured Lenders**") for a Senior Secured Loan (as amended) in the principal amount of $20 million, which was disbursed on May 12, 2015.

28. The principal due under the Senior Secured Loan is currently repayable in equal, quarterly installments of $962,000 from March 2018 through December 2021, with the entire balance being prepayable without penalty.

29. BioAmber Sarnia's obligations under the Senior Secured Loan are secured by (i) a first-ranking security interest on all of BioAmber Sarnia's assets and (ii) a pledge by the Debtor of its equity interest in BioAmber Sarnia.

30. In addition, the Debtor has provided the Senior Secured Lenders with a guarantee of 70% of BioAmber Sarnia's secured obligations under the Senior Secured Loan and Mitsui has provided a guarantee of the remaining 30% of the secured obligations under the Senior Secured Loan, which is capped at $6 million plus accrued interest on the secured obligations and fees and expenses. The Debtor and BioAmber Sarnia have agreed to indemnify Mitsui in relation to any payment it is required to make in relation to these obligations pursuant to the Mitsui Indemnity Agreement, as discussed further below.

31. The proceeds of the loan were used by BioAmber Sarnia to complete the construction of the Sarnia Facility and fund its startup and commissioning.

32. As of May 4, 2018, an aggregate amount of $14,422,615, net of restricted cash and excluding interest, was owed to the Senior Secured Lenders pursuant to the Senior Secured Loan.

    **ii.**     **The SIJF Loan**

33. On September 30, 2011, BioAmber Sarnia and the Ontario Minister of Economic Development and Trade ("**OMEDT**") entered into an agreement pursuant to which

the SIJF Loan of $15 million was granted to BioAmber Sarnia from the Sustainable Jobs Innovation Fund.

34. The SIJF Loan was interest free during the first five years, conditionally upon BioAmber Sarnia creating and retaining a certain average number of employees per year. Subsequently, the SIJF Loan bears interest at an annual rate of 3.98% (or 5.98% if the cumulative job targets were not met in the first five years). The principal of the SIJF Loan is repayable in five annual equal installments beginning from the sixth anniversary date of disbursement.

35. The SIJF Loan is secured by (i) a security interest in BioAmber Sarnia's present and future accounts receivable, inventory, equipment, and other personal property and (ii) a mortgage against the Sarnia Facility. The Debtor has also provided OMEDT with a guarantee to secure BioAmber Sarnia's obligations under the SIJF Loan.

36. As of May 9, 2018, an aggregate amount of $15,000,000, net of restricted cash and excluding interest, was owed to OMEDT pursuant to the SIJF Loan.

### iii. The Bridging Facility Claim

37. On September 9, 2016, the company entered into an agreement for a demand non-revolving credit facility with Bridging Finance Inc. ("**Bridging**"), and received the loan proceeds of $25 million, net of financing fees (the "**Bridging Facility**"). The proceeds were used to repay in full the outstanding principal amount of an existing loan and to fund general corporate expenses.

38. Amounts due pursuant to the Bridging Facility were secured by substantially all of the assets of BioAmber Canada and the Debtor, with the exception of certain

identified licenses and the equity interest in BioAmber Sarnia (collectively, the "**Bridging Security**").

39. On January 27, 2017, the Bridging Facility was fully repaid. On February 17, 2017, Bridging filed the Bridging Facility Claim against BioAmber Sarnia before the Superior Court of Justice of Ontario seeking approximately $922,000 as damages for breach of contract, unjust enrichment, or quantum meruit, in relation to the alleged failure to pay certain prepayment penalties, interest, and waiver fees in connection with the prepayment of the Bridging Facility. As a result of this ongoing litigation, Bridging has not released its security interest in the Bridging Security.

### iv. Mitsui Indemnity Agreement

40. On August 1, 2017, the Debtor and BioAmber Sarnia, on the one hand, and Mitsui, on the other hand, entered into the Mitsui Indemnity Agreement pursuant to which the Debtor and BioAmber Sarnia agreed to indemnify Mitsui for any payments made by Mitsui pursuant to its guarantees to OMEDT in relation to the SIJF Loan and to the Senior Secured Lenders in relation to the Senior Secured Loan.

41. The obligations of the Debtor under the Mitsui Indemnity Agreement are secured by all of its personal property, excluding certain of its assets, such as the shares of BioAmber Sarnia.

### v. The MAAF Loan

42. On March 10, 2014, BioAmber Sarnia and the Canadian Minister of Agriculture and Agri-Food ("**MAAF**") entered into a repayable contribution agreement pursuant to which the non-interest bearing MAAF Loan of $10 million was provided to BioAmber Sarnia under the Agri Innovation Program.

11

DOCS_SF:96797.3

43. As of May 4, 2018, an aggregate amount of $9,074,074, net of restricted cash and excluding interest, was owed to MAAF pursuant to the MAAF Loan. The Debtor guaranteed BioAmber Sarnia's obligations under the MAAF Loan.

### vi. The Securities Class Action

44. On March 18, 2017, a putative securities class action lawsuit was filed against the Debtor and certain of its executives in federal district court in New York alleging violations of the United States Exchange Act and the United States Securities Act. The complaint principally alleges that the prospectus for a January 2017 follow-on public offering failed to disclose the postponement of a large customer order.

45. On June 6, 2017, the Court appointed a lead plaintiff and lead counsel. On August 7, 2017, the lead plaintiff filed an amended complaint, which alleges violations of the United States Exchange Act. There are no United States Securities Act claims alleged in the amended complaint. The amended complaint is premised on allegedly false and misleading fourth quarter 2016 and fiscal year 2016 revenue projections set forth in the prospectuses for December 2016 and January 2017 public offerings.

46. On October 6, 2017, the Debtor and the other defendants filed a motion to dismiss the amended complaint. On February 9, 2018, the plaintiff filed a motion to, *inter alia*, convert defendants' motion to dismiss to a motion for summary judgment.

47. The foregoing motions are pending before the United States District Court for the Eastern District of New York, but were stayed contemporaneously with the filing of the Chapter 11 Case.

F. **Events Leading to CCAA Proceeding and Chapter 15 Case**

   i. **Historical Operating Losses**

   48. The Company started commercial operations at the end of 2015, and is currently ramping-up production at the Sarnia Facility. Accordingly, the Company is akin to a traditional start-up and has incurred losses from business operations since its inception.

   49. As of December 31, 2017, there was an accumulated deficit of $318.9 million and a net loss of $102.2 million, including a non-cash impairment loss and write-off of property, equipment, and intangibles of $77.6 million.

   50. The attainment of profitable operations is dependent upon future events, including successful ramp-up of the commercial-scale manufacturing Sarnia Facility, further advancing existing commercial arrangements with strategic partners to generate revenue from the sale of products that will support the Company's cost structure, gaining market acceptance for their bio-succinic acid, its derivatives and other building block chemicals, obtaining adequate financing to complete development activities, and attracting and retaining qualified personnel.

   51. Another factor which has caused problems for the Company in attempting to increase sales is the relatively low price of oil, which is the raw material for products which bio-succinic acid competes against.

   ii. **Liquidity Concerns and Sale Process**

   52. The Company estimates that approximately $8 million to $10 million of additional financing, to be disbursed in tranches, is needed over the next 4 to 6 months to continue operating the business at the Sarnia Facility and to engage in a fulsome sale and investment solicitation process ("**SISP**") with the ultimate goal of finding a financial or strategic buyer for the Company's assets and business as a going concern.

53. The Company believes that continuing operations at the Sarnia Facility will bring far more value to the creditors and other stakeholders than the incremental cost of continuing such operations, for the following reasons:[5]

    a. The Company's advisors estimate that the sale of its assets to a strategic or financial investor will realize approximately twice the value for creditors and other stakeholders as compared to a forced liquidation.

    b. Putting the Sarnia Facility in care and maintenance mode will cause operating staff and customers to leave, which will make the business inherently less attractive to potential purchasers who would like to operate it, especially strategic investors.

    c. The incremental cost of continuing operation of the Sarnia Facility, as opposed to putting it in care and maintenance mode, is estimated to be limited to $3 million over the next four months. Sales of inventory and the collection of accounts receivable after the four month period will reduce this differential.

    d. The value of the Company as a going concern has been estimated to be more than $30 million greater than an orderly liquidation value.

    e. The Company is simultaneously implementing a number of cost-cutting initiatives which will reduce the cash usage as compared to historical operational data.

    f. The Company has received indications that the demand for its assets and business is significant, and has already been contacted by several interested potential purchasers who would like to operate the Sarnia Facility as a going concern.

54. The Company, together with its advisors, has initiated a sale process with the following milestones:

---

[5] Production at the Sarnia Facility ceased on May 11, 2018 due to a shortage of raw materials. The Company anticipates resuming production once it receives postpetition financing, which it expects to occur around June 20, 2018.

| No. | Description | Date |
| --- | --- | --- |
| 1. | Identify potential going concern purchasers and potential debt and/or equity investors. | June 1, 2018 |
| 2. | Solicitation of offers to potential purchasers or investors, with access to a data room for those who have signed NDAs. | June 2 to June 20, 2018 |
| 3. | Deadline for submissions of indications of interest. | June 20, 2018 |
| 4. | Deadline to complete due diligent and submit a binding offer. | July 20, 2018 |
| 5. | Execution of successful bid transaction documents. | July 31, 2018 |

### G.   The CCAA Proceeding

55.   On May 24, 2018, the Company commenced the CCAA Proceeding in the Canadian Court, and the Canadian Court entered the CCAA Initial Order, granting certain provisional relief in connection with the CCAA Proceeding.  Subsequently, on the date hereof, the Foreign Representative commenced this chapter 15 case by filing, among other things, a verified chapter 15 petition seeking recognition by the Court of the CCAA Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

56.   Additional information about the CCAA Proceeding and the relief set forth in the CCAA Initial Order can be found in the Settino Declaration and the Memorandum of Law.

### BASIS FOR RELIEF REQUESTED

57.   As discussed in the Settino Declaration, and similar to the protection provided to a debtor under United States bankruptcy law, upon commencement of the CCAA Proceeding, all of the Debtor's creditors were stayed from taking any enforcement actions against the Debtor and its assets, wherever located.  Notwithstanding the worldwide application of the stay imposed by the CCAA Proceeding, there is a risk that the Debtor's creditors may attempt to pursue unilateral enforcement actions in the United States.  To protect against this

risk, the Foreign Representative commenced this chapter 15 case and, by this Motion, is seeking an order (i) granting recognition of the CCAA Proceeding, (ii) giving full force and effect in the United States to the CCAA Initial Order, and (iii) applying section 365 of the Bankruptcy Code to this chapter 15 case.  The entry of an order granting such relief would, among other things, extend the protections of the stay to BioAmber's assets located in the United States and prevent contract counterparties from modifying or terminating United States-based contracts.

### A.     CCAA Proceeding Is Entitled to Recognition as a Foreign Main Proceeding

58. Pursuant to this Motion, the Foreign Representative seeks, pursuant to sections 1517, 1520, and 1521 of the Bankruptcy Code, recognition and enforcement of the CCAA Initial Order, as well as the application of section 365 of the Bankruptcy Code to this chapter 15 case. Section 1517(a) of the Bankruptcy Code authorizes the Court to enter an order, after notice and a hearing, recognizing a foreign proceeding if (i) such proceeding is a foreign main proceeding or a foreign nonmain proceeding, (ii) the foreign representative applying for recognition is a person or body, and (iii) the application for recognition was properly filed in accordance with section 1515 of the Bankruptcy Code.  Section 1517(b) of the Bankruptcy Code further provides that such a proceeding shall be recognized as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests.

59. As more fully set forth in the Memorandum of Law and the Settino Declaration, the Foreign Representative respectfully submits that (i) the CCAA Proceeding is a foreign main proceeding within the meanings of sections 101(23) and 1502(4) of the Bankruptcy Code, (ii) the Foreign Representative is an authorized foreign representative within the meaning of section 101(24) of the Bankruptcy Code, and (iii) the verified chapter 15 petition was properly

filed in accordance with section 1515 of the Bankruptcy Code and is consistent with the purpose of chapter 15.

60.     The CCAA Proceeding should be recognized as a foreign main proceeding because it is pending in Canada, the center of the Debtor's main interests.  The Debtor's primary manufacturing facility is located in Sarnia, Ontario.  Substantially all of the Company's operations take place there.  The Debtor is managed on a consolidated basis out of its corporate headquarters in Montreal, Quebec.  Moreover, recognizing the CCAA Proceeding as a foreign main proceeding is consistent with the purpose of chapter 15 and United States public policy.

      **B.**      **Additional Relief Pursuant to Section 1521<br>of the Bankruptcy Code Is Warranted and Appropriate**

61.     The Foreign Representative also seeks an order applying section 365 of the Bankruptcy Code in this chapter 15 case pursuant to section 1521 of the Bankruptcy Code to prevent counterparties from exercising insolvency-related termination provisions.

62.     Section 1521(a) of the Bankruptcy Code provides that, upon recognition of a foreign proceeding, and "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of any creditors, the court may grant any appropriate relief . . . ." 11 U.S.C. § 1521.  Such relief includes, among other things, "extending [provisional] relief granted under section 1519(a)" and "granting any additional relief that may be available to a trustee."  *Id.*  Section 365(e) of the Bankruptcy Code offers critical protection to the Debtor, namely prohibiting contracts to be terminated based solely upon financial condition, bankruptcy filings, or insolvency events.

63.     Application of section 365 is warranted and necessary in this chapter 15 case. More than half of BioAmber's key suppliers are entities with a presence in the United States, many of whom are parties to contracts governed by United States law.  Approximately

17

half of the Company's customers are located in the United States, many of whom are parties to contracts governed by United States law. Although contract counterparties, including those whose contracts are exclusively governed by United States law, are subject to the jurisdiction of the Canadian Court and bound by the CCAA Initial Order, out of an abundance of caution and in order to fully protect its rights, the Foreign Representative seeks an order applying section 365 of the Bankruptcy Code in this chapter 15 case. Should the Debtor's key contracts be terminated, the Debtor would lose important rights and benefits thereunder, to the detriment of the Debtor's business and, in turn, its creditors. Thus, absent the relief requested, the Debtor and its creditors may suffer irreparable harm.

## CONCLUSION

64. The Foreign Representative respectfully submits that the CCAA Proceeding should be recognized as a foreign main proceeding and it is appropriate to apply section 365 in this chapter 15 case.

## NOTICE

65. The Foreign Representative has provided notice of the Motion to the following parties, or their counsel, if known: (i) all persons or bodies authorized to administer foreign proceedings of the Debtor; (ii) principal parties that have appeared in the CCAA Proceeding as of the date of service of the relevant pleadings; (iii) the Office of the United States Trustee for the District of Delaware; (iv) the Debtor's secured creditors and their counsel, if known (v) counsel to any parties in ongoing litigation with the Debtor; (vi) the Office of the Delaware Secretary of State; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**NO PRIOR REQUEST**

66. No previous request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Foreign Representative respectfully requests that the Court: (a) enter the proposed order, upon notice and a hearing, substantially in the form attached hereto as **Exhibit A**; and (b) grant such other and further relief as it deems just and proper.

Dated: May 30, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Laura Davis Jones (DE Bar No. 2436)
Jeremy Richards (CA Bar No. 102300)
Colin R. Robinson (DE Bar No. 5524)
Jason H. Rosell (CA Bar No. 269126)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
jrichards@pszjlaw.com
crobinson@pszjlaw.com
jrosell@pszjlaw.com

*Counsel to the Foreign Representative*